**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ONICA J. VICTORY,<br>*Plaintiff*,<br><br>v.<br><br>AMAZON.COM, INC.,<br>*Defendant*. | CASE NO. 3:25-CV-1532-KAD<br><br><br>AUGUST 20, 2026 |

**MEMORANDUM OF DECISION**
**RE: DEFENDANT'S MOTION TO DISMISS (ECF NO. 21)**

Kari A. Dooley, United States District Judge:

Plaintiff Onica J. Victory, proceeding *pro se*, commenced this civil action against Amazon.com, Inc., ("Amazon" or "Defendant"), alleging racial discrimination in violation of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"). On December 4, 2025, Defendant filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting that Plaintiff's Amended Complaint fails to sufficiently allege a racial discrimination claim under Title VII. *See* MTD, ECF No. 21. For the reasons set forth below, Defendant's Motion to Dismiss is **DENIED**.

**Allegations**

The following facts are set forth in the Amended Complaint and are accepted as true for the purposes of Defendant's Motion to Dismiss.

In August 2021, Plaintiff began working for Amazon in building "DOB2," as a Warehouse Associate. Am. Compl., ECF No. 17 at ¶ 2. As an African American, Plaintiff was a member of Amazon's Black Employee Network ("BEN"), an employee-led Affinity Group. *See id.* at ¶¶ 2, 4. While at DOB2, Plaintiff received multiple promotions, and eventually secured a "Data Analyst

Tier 3" position at a different Amazon building, "BLD3." *Id.* at ¶ 3. In October 2023, Plaintiff was voted in as President of the "BDL3 Node" of the BEN. *Id.* at ¶ 4.

After Plaintiff's promotion to a Tier 3 Data Analyst, she "was not paid according to incentivized pay due to system coding that was not in her control." *Id.* at ¶ 5. Amazon's Human Resources ("HR") department was "unwilling to "manipulat[e]" this "employee coding" for Plaintiff, but did so for other employees. *Id.* Likewise, in May 2023, management at Amazon told Plaintiff that Tier 3 Data Analysts did not have work-from-home opportunities, even though "other analysts were able to work from home." *Id.* at ¶ 7. During this time, Plaintiff also "endured harassment from co-workers due to her race." *See id.* A co-worker used the term "slave girl," and later suggested, "in a rude manner," that as an Affinity Group activity, the BEN could pick up trash around the building property, including a "huge pile of trash" next to the co-worker's car. *Id.* Plaintiff filed a complaint about this "insulative, harassing, and unconducive working environment due to Plaintiff's [race]," which led to an investigation by an "Amazon Internal entity." *See id.* at ¶ 8. The investigation was ineffective, and in fact, the Amazon investigator only "perpetuated the discriminatory environment and harassment" by ignoring Plaintiff's requests "to be cautious with [the] investigative process" and preserve her anonymity, and refusing to accommodate a death in Plaintiff's family that impacted her ability to meet with the investigator. *Id.* at ¶ 8.

As President of BLD3's BEN, Plaintiff was responsible for organizing social events. *See id.* at ¶¶ 6, 9–12, 17. Yet, in February 2024, Plaintiff was "met with unrealistic requirements when attempting to plan" BEN events, having been "given restrained budgets" and otherwise lacking sufficient funding from Amazon. *See id.* at ¶ 9. For example, Plaintiff was forced to "negotiate impractical terms for cookies" for an event, which in "previous years . . . was not an issue." *Id.* Furthermore, throughout February 2024, "there were no Affinity Group benefits afforded to the

BEN despite compliance [with] the application of said benefits." *Id.* at ¶ 11. When Plaintiff reached out to the global BEN Co-Presidents, she was told that "BDL3 had a reputation." *Id.* at ¶ 12. The following month, an Amazon HR representative said that "due to us just coming out of Black History [M]onth, African American figures shouldn't be included as a part of the main presentation for Women's History Month." *Id.* at ¶ 17. On another occasion, HR questioned Plaintiff "on the relevancy of the BEN Black History Month Main Presentation/Display." *See id.* at ¶ 19.

On February 20, 2024, a BDL3 security guard told Plaintiff that she was observed driving unsafely in the parking lot. *Id.* at ¶ 15. The security guard notified Plaintiff that he would be reporting the incident, as Amazon had recently "posted notice that they were launching a safety campaign to 'coach' unsafe parking lot behaviors." *Id.* Later that day, HR approached Plaintiff to discuss the security guard's claim that she drove over the speed limit and failed to stop at multiple stop signs. *Id.* at ¶ 16. Plaintiff repeatedly asserted that she did not drive unsafely. *Id.* at ¶¶ 15–16. One week later, HR again approached Plaintiff and told her that the Safety Team was investigating the parking lot incident. *Id.* at ¶ 18.

On March 20, 2024, Plaintiff met with HR again. *Id.* at ¶ 19. On this occasion, Plaintiff was informed that she was being "terminated for a 'high level' safety violation at the discretion of the safety team." *Id.* HR indicated that there were no other concerns or issues related to her job performance. *Id.* Plaintiff's termination occurred one day after the BEN met and submitted a proposal for a Juneteenth event, "where the theme was to educate individuals on their rights and procedures to address workplace grievances with [the Connecticut Commission on Human Rights and Opportunities] and [the U.S. Equal Employment Opportunity Commission]." *Id.*

Liberally construed, the Amended Complaint asserts a claim under Title VII, arising from Plaintiff's "discriminatory termination based upon race." *See* Am. Compl. at ¶ 20. Plaintiff seeks "compensatory damages, . . . lost wages, . . . punitive damages, . . . recovery of court and attorney fees, . . . allowance back on Amazon property in applicable situations, . . . allowances to contract with Amazon as a vendor, [and] access to the BEN Swag, along with any other relief the Court finds to be just and proper." *See id.* at 5.

**Procedural History**

On August 5, 2025, Plaintiff filed a Complaint against Defendant in New Haven Superior Court, Docket No. NNH-CV25-5064420. *See* ECF No. 1 at 1. On September 15, 2025, Defendant removed the case to this Court pursuant to 28 U.S.C. §§ 1441, 1446. *See* ECF No. 1. Plaintiff filed the operative Amended Complaint on November 5, 2025.[1] *See* ECF No. 17. On December 4, 2025, Defendant filed a Motion to Dismiss the Amended Complaint, with an accompanying memorandum of law. *See* MTD, ECF No. 21; Def. Mem., ECF No 21-1. Plaintiff filed an opposition to the Motion to Dismiss on December 29, 2025. Pl. Opp., ECF No. 22. On January 13, 2026, Defendant filed a reply brief. Def. Reply, ECF No. 23. On February 3, 2026, Plaintiff impermissibly filed a sur-reply in further opposition to the Motion to Dismiss, Pl. Sur-Reply, ECF No. 24, which the Court has nonetheless permitted and considered in light of Plaintiff's status as a *pro se* litigant, *see* ECF No. 25.

**Standard of Review**

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

[1] On October 22, 2025, Defendant filed a Motion to Dismiss the Complaint. ECF No. 13. On November 5, 2025, upon receipt of Plaintiff's Amended Complaint, the Court denied Defendant's Motion to Dismiss as moot. *See* ECF No. 19.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678. Nevertheless, when reviewing a motion to dismiss, the Court must accept well-pleaded factual allegations as true and draw "all reasonable inferences in the non-movant's favor." *Interworks Sys. Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 699 (2d Cir. 2010). Moreover, where a plaintiff proceeds *pro se*, the Court must construe his pleadings liberally, and interpret the

complaint to raise the strongest arguments it suggests. *See Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007).

**Discussion**

The Court has liberally construed the Amended Complaint as attempting to assert a Title VII discrimination claim arising from Plaintiff's termination by Amazon.[2] In seeking dismissal, Defendant argues that the Amended Complaint consists of "naked assertions" and "generalized claims of unfair treatment and discrimination" that are insufficient to state a plausible claim under Title VII. Def. Mem. at 5. In response, Plaintiff contends that she has adequately alleged a prima facie case for discrimination under Title VII. The Court agrees with Plaintiff.

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2. A plaintiff bringing a Title VII discrimination claim must allege that she "[1] is a member of a protected class, [2] was qualified, [3] suffered an adverse employment action, and [4] has at least minimal support for the proposition that the employer was motivated by discriminatory

---

[2] To the extent Plaintiff brings any purported Title VII discrimination claim as arising from either Plaintiff's co-worker's inappropriate remarks, or Defendant's ensuing inadequate internal investigation, the Complaint fails to state such a claim. While "[r]emarks may raise an inference of discrimination if there is a nexus between the remarks and an adverse employment decision," *Mesias v. Cravath, Swaine & Moore LLP*, 106 F. Supp. 3d 431, 438 (S.D.N.Y. 2015), isolated actions and statements by co-workers with no authority over a plaintiff do not support an inference of discriminatory intent. *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark"); *see also Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992). And here, there is no suggestion whatsoever that the co-worker who allegedly referred to Plaintiff as a "slave girl" and otherwise disparaged the BEN was involved in any way in Plaintiff's termination. Moreover, even if Defendant's "improperly handled" internal investigation into the co-worker's remarks could somehow constitute an adverse employment action, the Amended Complaint does not sufficiently allege that the investigation itself was motivated by Plaintiff's race. *See Phillips*, 2026 WL 2042422 at *5. The Amended Complaint also fails to plausibly describe a workplace "permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that [was] 'sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive working environment,'" so as to adequately allege a hostile work environment claim under Title VII. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). The Amended Complaint is assessed only as to whether Plaintiff's termination was itself motivated by discriminatory animus in violation of Title VII.

intent." *See Phillips v. Conn. Dep't of Soc. Servs.*, No. 3:25-CV-1423 (SFR), 2026 WL 2042422, at *5 (D. Conn. July 15, 2026) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015)). The factual allegations "necessary to survive a motion to dismiss should align with the 'reduced requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation." *Id.* Thus, a complaint "need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination; instead, the complaint only needs to support a minimal inference of discriminatory motivation." *Id.* (internal quotation marks omitted). "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or *the sequence of events leading to the plaintiff's discharge*.'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)) (emphasis added); *see also Washington v. Davis*, 426 U.S. 229, 242 (1976) (holding that "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts").

Here, Plaintiff, as an African American, is unquestionably a member of a protected class, and her multiple promotions suggest that she was qualified as a Tier 3 Data Analyst. Plaintiff also clearly suffered an adverse employment action when she was terminated in March 2024. Defendant does not appear to challenge the sufficiency of these allegations. Accordingly, the sufficiency of Plaintiff's Title VII claim depends on whether the Amended Complaint adequately alleges "at least minimal support for the proposition that [Defendant] was motivated by discriminatory intent" when it terminated Plaintiff's employment. *See Phillips*, 2026 WL 2042422 at *5. The Court finds that it does.

To be sure, the Amended Complaint sets forth a rather confusing and haphazard narrative of Plaintiff's employment with Amazon. And Defendant is correct that many of the allegations therein are wholly conclusory. Further, the Amended Complaint alleges a series of purportedly "discriminatory" or "harassing" occurrences with no obvious or even discernable nexus to Plaintiff's ultimate termination. For example, it is unclear how, in isolation, the inappropriate remarks made by Plaintiff's co-worker and the investigation that ensued, support the inference that Plaintiff was later fired due to her race. This is particularly true when considering Plaintiff's allegations as to Amazon's proffered, race-neutral basis for her termination, that is, Plaintiff's "high-level" parking lot safety violation. Nevertheless, the Court finds that the alleged circumstances leading to Plaintiff's termination in March 2024, taken together, provide the requisite minimal support for the proposition that Defendant was motivated by discriminatory animus.

The Amended Complaint alleges that after an investigation into Plaintiff's "unsafe parking lot behavior" in February 2024, Defendant terminated Plaintiff on March 20, 2024, "at the discretion of [its] safety team," due to a "high level safety violation" ostensibly stemming from Plaintiff "speeding and running multiple stop signs" in the BLD3 parking lot. Plaintiff denied any unsafe driving. And significantly, the Amended Complaint further alleges that Defendant terminated Plaintiff *the day after* the BEN (of which Plaintiff was the BLD3 President) submitted a proposal for a Juneteenth event centered around "educat[ing] individuals on their rights and procedures to address workplace grievances with the CHRO and EEOC." *See* Am. Compl. at ¶ 19. The Court finds that the alleged proximity between Plaintiff's efforts to organize a celebration of Black American heritage and her termination, when coupled with Plaintiff's additional allegations—specifically that: (a) she did not engage in any unsafe driving, *id.* at ¶¶ 15–16; (b) the

BEN affinity group was regularly underfunded or subjected to additional "unrealistic requirements," *id.* at ¶¶ 9–11; (c) HR had previously questioned "the relevanc[e] of the BEN Black History Month Main Presentation/Display," *id.* at ¶ 19; and (d) HR later suggested that "African American figures shouldn't be included as a part of the main presentation for Women's History Month," "due to [Amazon] just coming out of Black History [M]onth," *id.* at ¶ 17—is sufficient to create a minimal inference of discriminatory motivation. Indeed, such allegations "provide 'relevant background evidence' by shedding light on Defendant's motivation," and bolster any claim that Defendant treated Plaintiff differently because of her race, and/or that Plaintiff's race was a motivating factor in Defendant's employment decision. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015) (denying a motion to dismiss where the actions of a school district in placing a "University of Puerto Rico" banner outside a teacher's classroom and "attempt[ing] to transfer him to a Hispanic principal's school" were "plausibly connected to [the plaintiff's] Hispanic background and therefore provide a contextual basis for inferring discrimination").[3]

Ultimately, Plaintiff's Amended Complaint, though sparse, haphazard, and largely conclusory, contains just enough factual detail to cross "the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678. Accordingly, the Amended Complaint may proceed on

---

[3] Defendant also asserts that Plaintiff does not identify any "similarly situated comparators." *See* Def. Mem. at 8. But Plaintiff's failure to do so is not fatal to her Title VII claim. Indeed, while it is true that "[a] plaintiff may raise an inference of discrimination by 'showing that the employer . . . treated her less favorably than a similarly situated employee outside her protected group,'" *Johnson v. Dep't of Correction*, No. 3:22-CV-112 (KAD), 2024 WL 1256045, at *6 (D. Conn. Mar. 25, 2024) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)), that is not the only way to sufficiently allege a Title VII discrimination claim. And here, as discussed, Plaintiff's Title VII claims are facially plausible due in large part to the "the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312.

Plaintiff's claim that her termination from Amazon violated Title VII, and Defendant's Motion to Dismiss is **DENIED**.[4]

**Conclusion**

For all of the foregoing reasons, Defendant's Motion to Dismiss is **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut, this 20th day of August 2026.

*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

[4] Based on Plaintiff's allegations, it is unclear whether she is also attempting to assert a retaliation claim under Title VII, arising either out of her planned Juneteenth celebration or from the internal complaint about her co-worker's disparaging remarks towards Plaintiff and the BEN. *See* Am. Compl. at ¶¶ 7–8. Insofar as the Court has denied the Motion to Dismiss and permitted the Amended Complaint to proceed, it need not address the sufficiency of any theoretical Title VII retaliation claim. If Plaintiff intended to bring such a claim, she may seek leave of Court to further amend the Amended Complaint.